[Cite as *State v. Fridley*, 2019-Ohio-3412.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 17AP0029 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| BRYAN FRIDLEY | WAYNE COUNTY MUNICIPAL COURT COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2017 CRB 000355 |

DECISION AND JOURNAL ENTRY

Dated: August 26, 2019

TEODOSIO, Presiding Judge.

{¶1} Defendant-Appellant, Bryan Fridley, appeals from the judgment of the Wayne County Municipal Court. This Court affirms.

I.

{¶2} Mr. Fridley and V.P. had been friends for several years when they met one night at his mother's house. V.P. had been increasingly reluctant to spend time with Mr. Fridley because he had begun to overreact at the end of their evenings. Each time V.P. would indicate that she needed to leave, Mr. Fridley would pressure her to stay, would argue with her, and would accuse her of not caring for him. Though he had promised not to overreact that evening, Mr. Fridley once again became upset when V.P. announced that it was time for her to leave. The two began to argue as they were standing outside, and V.P. decided to call her father in the hopes that the call would deter Mr. Fridley. As soon as she dialed her father's number, however, Mr.

Fridley snatched her cell phone and climbed into his mother's car. V.P. then followed him inside the car to retrieve her phone.

{¶3} Mr. Fridley ultimately drove off with V.P. in the car and refused to stop or take her back to her car. As he began running stop signs and driving erratically, V.P. screamed for help and begged Mr. Fridley to let her go. Unbeknownst to either of them at the time, V.P.'s call to her father had connected and he listened helplessly as V.P. repeatedly screamed for help. The incident finally came to an end when Mr. Fridley lost control of the car and crashed into a ditch. As a result of the crash, both Mr. Fridley and V.P. sustained serious injuries.

{¶4} Mr. Fridley was ultimately charged with aggravated menacing, assault, unlawful restraint, and criminal mischief. A jury found him not guilty of aggravated menacing and assault, but guilty of the lesser-included offense of menacing, unlawful restraint, and criminal mischief. The trial court sentenced him to jail time, a fine, and one year of community control. Upon motion, the court stayed the execution of his sentence for purposes of his appeal.

{¶5} Mr. Fridley now appeals from his convictions and raises three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR ONE**

APPELLANT'S CONVICTIONS FOR MENACING, CRIMINAL MISCHIEF, AND UNLAWFUL RESTRAINT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE EVIDENCE SUPPORTED THAT THE VICTIM HAD FALSE MEMORIES SURROUNDING THE EVENTS, AND APPELLANT OFFERED EVIDENCE THAT HE DID NOT TAKE THE VICTIM'S TELEPHONE, DID NOT PREVENT HER FROM GETTING OUT OF THE VEHICLE, AND DID NOT MAKE ANY THREAT OF HARM TO HER.

{¶6} In his first assignment of error, Mr. Fridley argues that his convictions are against the manifest weight of the evidence. We do not agree.

**{¶7}** This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

**{¶8}** A person commits menacing if he "knowingly cause[s] another to believe that [he] will cause physical harm to the person or [his or her] property * * *." R.C. 2903.22(A). An unlawful restraint occurs if a person, "without privilege to do so, * * * knowingly restrain[s] another of the other person's liberty." R.C. 2905.03(A). Finally, a person commits criminal mischief if he "[w]ithout privilege to do so, knowingly move[s], deface[s], damage[s], destroy[s], or otherwise improperly tamper[s] with * * * [t]he property of another * * *." R.C. 2909.07(A)(1)(a). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

**{¶9}** V.P. testified that she and Mr. Fridley had been friends for several years before the events giving rise to this matter transpired. The two did not have a romantic relationship, but V.P. believed that Mr. Fridley was interested in being more than just friends. She indicated that

she sometimes felt pressured by him when they spent time together because he never wanted her to leave. Whenever it was time for her to go, Mr. Fridley would become upset, argue with her, or try to guilt her into staying with him. The month before this incident transpired, Mr. Fridley had gone so far as to take V.P.'s car keys to force her to stay. She testified that his actions upset her and caused her not to speak with him for several weeks.

{¶10} A few days before Christmas, V.P. agreed to meet Mr. Fridley at the house he shared with his mother so that they could spend time together. V.P. testified that she repeatedly warned Mr. Fridley that she would need to leave by 10:30 p.m. because she hoped to avoid another incident. According to V.P., Mr. Fridley initially indicated that he would have no problem with her leaving at that time. As their evening drew to a close, however, he once again became upset. Mr. Fridley then accused V.P. of having plans with someone else, of not supporting him through a difficult time, and of not being important to her. Although V.P. attempted to reassure him, the two began to argue.

{¶11} V.P. testified that she and Mr. Fridley were standing outside smoking when they started arguing about her departure. Because Mr. Fridley was making her feel anxious and pressured, V.P. decided to call her father. She removed her cell phone from her purse and told Mr. Fridley that she was making the call, hoping it would defuse the situation. As soon as she dialed her father's number, however, Mr. Fridley snatched her phone and put it in his coat pocket. Ignoring her demands to return the phone, he climbed into the driver's seat of his mother's car. V.P. testified that Mr. Fridley already had the keys to the car because they had borrowed the car earlier that evening.

{¶12} V.P. entered the car on the passenger's side and closed the door behind her. She testified that she continued to argue with Mr. Fridley for several minutes, demanding that he

return her phone.  Instead of doing so, Mr. Fridley started the car and "took off out the driveway."  V.P. stated that she quickly felt she had lost control over the situation because Mr. Fridley kept driving and ignored her commands to drive back to the house.  V.P. put her seat belt on when Mr. Fridley began driving, but removed it when she noticed they were approaching a stop sign.  She testified that she planned to jump from the car once they stopped, but Mr. Fridley anticipated her plan and sped through the stop sign.

{¶13}  As Mr. Fridley began to drive erratically and continued to ignore V.P.'s pleas to stop, V.P. became "very, very scared."  She began screaming at Mr. Fridley to let her go and yelled out the window for help.  She testified that, at one point, she even yelled that he was raping her in the hopes that someone would hear and call the police.  According to V.P., Mr. Fridley said he would kill them both and wrapped his arm around her purse strap to hold her in place.  He also later grabbed her hair and forced her down toward the gear shift, causing her a great deal of pain.  Not long after he did so, V.P. recalled waking up in the car to discover that they had crashed.  She testified that Mr. Fridley then handed over her cell phone so she could call for help.  As a result of the crash, V.P. sustained serious injuries, including a concussion, a brain hemorrhage, and numerous facial fractures.

{¶14}  Once Mr. Fridley returned her phone to her, V.P. realized that the call she had placed to her father had connected and he was still on the line.  V.P.'s father testified that he received her call just before 10:00 p.m. and listened helplessly as she screamed, pleaded for her life, and, at one point, yelled that the man she was with was trying to rape her.  Though he called 911 on a separate line, neither he, nor the 911 operator could pinpoint V.P.'s location.  He testified that he listened to V.P. scream until she fell silent, at which point he and his wife feared she was dead.  After ten minutes of silence, he then heard V.P.'s voice again as she asked for her

phone and realized he was on the line. V.P. told her father that she was scared, that there was "blood everywhere," and that "[h]e wrecked the car."

{¶15} When V.P.'s father called 911 from his landline, he placed his cell phone on speaker phone so that his wife and the 911 operator could hear V.P. The 911 recording captured the sound of a woman repeatedly screaming for help and yelling for someone to let her go over the course of several minutes. The State played the recording at trial, and V.P.'s father confirmed that the woman screaming for help was V.P.

{¶16} Deputy Matthew Gajda spoke separately with Mr. Fridley and V.P. at the hospital immediately after the crash. He indicated that V.P.'s version of the events remained consistent as he spoke with her. She described Mr. Fridley arguing with her, taking her cell phone, driving erratically, ignoring her screams, pulling her hair, and crashing the car. Meanwhile, Mr. Fridley changed his story several times as he described what happened. The deputy specified that Mr. Fridley initially said V.P. had been driving the car, but later admitted he had been driving. Mr. Fridley then claimed that V.P. was suicidal and had caused the crash when she grabbed the wheel. Although Mr. Fridley admitted that he had been holding V.P.'s phone, he claimed it was only because he was using it to search for music.

{¶17} Mr. Fridley testified in his own defense. He described himself as V.P.'s best and only friend and described her as troubled and suicidal. Though he acknowledged that they had been friends for several years, he described their relationship as relatively one-sided, with V.P. invariably initiating their exchanges. He denied that the two of them had experienced a brief falling out or that he had stolen her car keys to force her to stay with him. According to Mr. Fridley, he took V.P.'s keys on that occasion because she was under the influence and he did not want her to drive.

{¶18} Mr. Fridley stated that, on the day of the crash, he was reluctant to see V.P. There had been a series of "steady incidents" that had caused his mother to ban V.P. from their home, so he knew V.P. was not welcome there. Nevertheless, he testified that he agreed to meet V.P. outside, and they spent time driving around in his mother's car listening to music. He indicated that they briefly returned to his home so that he could run inside for a few things, but V.P. remained outside. Once he returned to the car, they continued to drive around. Mr. Fridley denied that V.P. called her father before they left. Instead, he claimed that she placed the call at some later point in time and that she had control of her cell phone because she was using it to listen to music.

{¶19} Mr. Fridley denied that he ever restrained V.P. or refused to let her go. He recalled that the reason she began screaming was because he had found something in her glove box earlier that evening and became upset when he confronted her about it. He claimed that, as they were driving, V.P. removed her seat belt and tried to jump from the car as they were traveling down a hill in a 35-m.p.h. zone. After he grabbed her to stop her from jumping, he came to a stop and V.P. calmed down somewhat. Once he began driving again, however, V.P. tried to "jerk the wheel and scratch [his] eyes." Mr. Fridley described V.P. as being prone to violent outbursts and stated that she had expressed a desire to commit suicide that evening. Nevertheless, he claimed that he then allowed her to drive. The next thing Mr. Fridley knew, he woke up in a ditch because V.P. had crashed the car.

{¶20} To the extent Mr. Fridley made inconsistent statements to the police, he claimed that he was confused because the hospital had given him morphine. He testified that he was in a great deal of pain after the crash because he had sustained a shattered femur, as well as fractured ribs and several other injuries. Mr. Fridley vehemently denied that he had ever tried to hurt V.P.

While he admitted that he could have used his cell phone to call 911 when she began to act erratically, he stated that he did not do so because "she didn't seem like she needed it," she ordinarily "screams a lot," and she had experienced "these sort[s] of episodes before."

{¶21} Mr. Fridley argues that the jury lost its way when it disregarded his testimony and chose to believe the State's witnesses. He asserts that V.P. lacked credibility because she admitted she had false memories of this incident and certain aspects of her story were nonsensical. For example, he argues that, if he had actually stolen her phone, she would have opened the driver's side door of the car to retrieve it instead of climbing into the car with him. He notes that the jury specifically rejected V.P.'s claims that he threatened to kill her, that he pulled her hair, or that he purposely crashed the car, as it found him not guilty of aggravated menacing and assault. Due to the issues with V.P.'s credibility and the fact that the jury clearly rejected portions of her testimony, Mr. Fridley argues that his convictions are against the manifest weight of the evidence.

{¶22} Having reviewed the record, we cannot conclude that the jury lost its way when it found Mr. Fridley guilty of menacing, unlawful restraint, and criminal mischief. V.P. described in detail how Mr. Fridley took her phone, refused to let her go, ignored her pleas for help, forcefully grabbed her, threatened to kill them both, and crashed the car. While she acknowledged that she had one false memory of the incident, she specifically testified that it pertained to something that occurred after the crash. She denied that her concussion affected her memory of the events leading up to it. Further, the officer who interviewed her indicated that her version of the events remained consistent while Mr. Fridley's changed several times. Though Mr. Fridley claimed that V.P. was suicidal and simply prone to screaming, the jury heard V.P. on the 911 recording, screaming for help and yelling for someone to let her go. As the trier of fact,

the jury was in the best position to evaluate the evidence and to determine the credibility of the witnesses. *See State v. Hudson*, 9th Dist. Summit No. 28755, 2018-Ohio-1920, ¶ 25. We will not conclude that the jury lost its way simply because it "chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Moreover, the fact that the jury found Mr. Fridley not guilty on certain counts is inapposite, as even inconsistent responses on separate counts will not justify overturning a verdict. *See State v. Wasil*, 9th Dist. Wayne No. 18AP0001, 2018-Ohio-4463, ¶ 7. Mr. Fridley has not shown that this is the exceptional case where the evidence weighs heavily against his convictions. *See Otten*, 33 Ohio App.3d at 340. Accordingly, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

> THE TRIAL COURT DENIED APPELLANT A FAIR TRIAL BY ACTING IN A PREJUDICIAL MANNER AGAINST APPELLANT AND HIS COUNSEL IN FRONT OF THE JURY.

{¶23} In his second assignment of error, Mr. Fridley argues that certain behavior on the part of the trial judge improperly influenced the jury and deprived him of his right to a fair trial. Upon review, we reject his argument.

{¶24} "It is well[-]settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 34. The term "biased,"

> when used in reference to a judge before whom a cause is pending[,] implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.

*State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus. "'[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias.'" *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 74, quoting *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir.2005). "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5.

{¶25} The record reflects that, on direct examination, Mr. Fridley frequently gave lengthy responses to even simple questions and supplied answers that, at best, were tangentially related to the questions he had been asked. That pattern continued on cross-examination, with Mr. Fridley frequently supplying answers that either did not speak to the call of the question or denigrated V.P.'s character in some manner. After sustaining several objections, cautioning Mr. Fridley to answer the question he had been asked, and striking several of his answers, the trial judge stopped waiting for the prosecutor to object. Instead, the judge interjected whenever it became clear that Mr. Fridley was not going to answer the specific question he had been asked. The judge ultimately threatened to hold Mr. Fridley in contempt if he refused to listen to and answer the questions he had been asked. Even so, the judge never actually held Mr. Fridley in contempt. Instead, she continued to interject, caution him, and limit his answers.

{¶26} Mr. Fridley argues that the trial judge "engaged in a pattern of behavior that suggested to the jury that the judge did not believe in the merits of [his] case * * *." According to Mr. Fridley, the judge allowed V.P. to testify without interruption, but repeatedly prevented him from offering testimony that cast her in a negative light. He notes that the judge routinely

intervened during his testimony, even when there was no objection from the State. He further notes that the judge repeatedly admonished him in front of the jury and threatened to hold him in contempt. Because the judge treated the State's witnesses differently and interfered with the presentation of his defense, Mr. Fridley argues, the judge improperly influenced the jury and deprived him of his right to a fair trial.

{¶27} Upon review, we reject Mr. Fridley's assignment of error for three reasons. First, Mr. Fridley failed to object to any of the trial judge's allegedly improper rebukes or comments and has not argued plain error on appeal. *See State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2017-Ohio-4030, ¶ 12; *State v. Butler*, 9th Dist. Summit No. 23786, 2008-Ohio-781, ¶ 31 (declining to construct a plain error argument on behalf of appellants who failed to object to a trial judge's comments at trial). Second, apart from criticizing the trial judge's rulings as one-sided, Mr. Fridley has made no attempt to show that those rulings were actually incorrect; a difficult feat given that trial judges are presumed unbiased and enjoy broad discretion in controlling the presentation of evidence and the examination of witnesses. *See In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, at ¶ 5; *State v. Jacobs*, 9th Dist. Summit No. 27545, 2015-Ohio-4353, ¶ 20; Evid.R. 611(A). Finally, to the extent Mr. Fridley seeks to void his convictions due to the trial judge's alleged bias, we lack the authority to do so. *See Powell* at ¶ 13. "An Ohio district court of appeals 'has no authority to * * * void a trial court's judgment on the basis of personal bias or prejudice on the part of a trial judge.'" *State v. Smetana*, 9th Dist. Lorain No. 12CA010252, 2013-Ohio-2376, ¶ 10. For the foregoing reasons, we overrule Mr. Fridley's second assignment of error.

## ASSIGNMENT OF ERROR THREE

APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE FOR ANTAGONIZING THE JUDGE, FAILING TO PROFFER RELEVANT

EVIDENCE, AND FAILING TO PREPARE FOR TRIAL BY OBTAINING WITNESSES AND EVIDENCE THAT SUPPORTED APPELLANT'S TESTIMONY.

{¶28} In his third assignment of error, Mr. Fridley argues that he received ineffective assistance of counsel. Specifically, he argues that he was prejudiced when his counsel antagonized the trial judge, failed to proffer certain evidence, and failed to adequately prepare for trial. Upon review, we reject his arguments.

{¶29} To prove ineffective assistance of counsel, one must establish that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice can be shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus. "[T]he Court need not address both *Strickland* prongs if an appellant fails to prove either one." *State v. Lortz*, 9th Dist. Summit No. 23762, 2008-Ohio-3108, ¶ 34.

{¶30} Mr. Fridley first argues that he received ineffective assistance of counsel because his attorney antagonized the trial judge. He claims that defense counsel antagonized the judge when counsel tried to elicit additional testimony on a point the judge had already deemed irrelevant. The point related to V.P.'s alleged attempts to contact Mr. Fridley after his charges had been filed and a no-contact order was in place. The judge had already sustained two relevancy objections when defense counsel broached the subject again. The prosecutor then objected, and the court responded as follows:

> THE COURT: This, there is no point in this. This has nothing to do with these charges. It is outside of the scope of what we [are] doing [defense counsel]. So,

let's, do you have any other questions that deal with this incident? We will entertain them, otherwise, I think you're done.

Mr. Fridley argues that his counsel's actions prejudiced him because the court's admonishment cast the defense in a negative light.

**{¶31}** Assuming without deciding that Mr. Fridley has satisfied *Strickland's* deficient performance prong, he still has not shown that his counsel's error resulted in actual prejudice to his defense. *See Strickland* at 687. The jury heard V.P.'s testimony as well as the 911 recording that captured her screaming. For several minutes, V.P. screamed for help and yelled at someone to let her go. The jury was able to weigh that evidence against Mr. Fridley's claim that V.P. did not need help and ordinarily screamed a lot. Mr. Fridley has not shown that, but for his counsel's line of questioning, the jury would not have convicted him. *See Bradley* at paragraph three of the syllabus. Accordingly, we reject his argument to the contrary.

**{¶32}** Next, Mr. Fridley argues that he received ineffective assistance of counsel because his attorney failed to proffer certain evidence or adequately prepare for trial. He argues that his attorney could have (1) subpoenaed certain witnesses for the defense, including his mother and a friend, and (2) tracked down certain evidence to corroborate his version of the events, including a gas station receipt and, possibly, a surveillance video. Yet, "generally speaking, the decision to call, or not call, witnesses falls within the purview of trial strategy." *State v. Ball*, 9th Dist. Summit No. 26537, 2013-Ohio-3506, ¶ 41. Moreover, "a claim of ineffective assistance of counsel on direct appeal cannot be premised on decisions of trial counsel that are not reflected in the record of proceedings[,] * * * [or] [s]peculation regarding the prejudicial effects of counsel's performance * * *." *State v. Leyland*, 9th Dist. Summit Nos. 23833 & 23900, 2008-Ohio-777, ¶ 7. Mr. Fridley presumes that additional witnesses would have been willing to testify and would have offered favorable testimony. Further, he presumes

that additional, exculpatory evidence existed. Because his argument is entirely speculative in nature and premised on decisions that are not reflected in the record, Mr. Fridley cannot establish that he received ineffective assistance of counsel. *See id.* Accordingly, his third assignment of error is overruled.

III.

**{¶33}** Mr. Fridley's assignments of error are overruled. The judgment of the Wayne County Municipal Court is affirmed.

Judgment affirmed.

―――――

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Wayne County Municipal Court, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

CHRISTINA I. REIHELD, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.