[Cite as *State v. Fortune*, 2020-Ohio-3606.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 19AP0024 |
| | |
| Appellee | |
| | |
| v. | APPEAL FROM JUDGMENT |
| | ENTERED IN THE |
| RICHARD FORTUNE II | COURT OF COMMON PLEAS |
| | COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2018 CRC-I 000142 |

DECISION AND JOURNAL ENTRY

Dated: July 6, 2020

---

SCHAFER, Judge.

**{¶1}** Defendant-Appellant, Richard Fortune II, appeals from his convictions in the Wayne County Court of Common Pleas. This Court affirms.

I.

**{¶2}** D.M. and M.F. are the stepdaughters of Mr. Fortune. He married their mother when D.M. was five years old and M.F. was one year old. He later adopted M.F., and she understood Mr. Fortune to be her biological father until she was fourteen years old. Mr. Fortune and the girls' mother also had two children together. Their daughter was born about a year and a half after they married, and their son was born about three years after that.

**{¶3}** When D.M. was ten or eleven years old, she told her mother that Mr. Fortune had sexually abused her. Her accusations went uninvestigated because she recanted, but other issues arose as time went on. Mr. Fortune was later investigated for having a sexual relationship with a teenager and, around that same time, D.M. and M.F. told their mother that he had abused them.

The girls also told friends about the abuse at various points, but none of their disclosures resulted in any action being taken against Mr. Fortune.

{¶4} When M.F. was a preteen and D.M. was a teenager, Mr. Fortune left their mother for the teenage girl he had been seeing. His new relationship did not last long, however, and he attempted suicide when the girl ended things. Mr. Fortune spent several days in a coma and several weeks under observation, during which time D.M. and M.F.'s mother visited him. When it was time for him to be released, they agreed to reconcile. Nevertheless, infidelity was an ongoing issue in their relationship, and there were times when the family lived apart.

{¶5} Shortly after she turned seventeen, M.F. began seeing a psychiatrist and confessed that Mr. Fortune had sexually abused her in her youth. The psychiatrist reported the abuse to the authorities, and an investigation ensued. During that investigation, D.M. likewise informed the authorities that Mr. Fortune had sexually abused her when she was younger. Their disclosures ultimately led to Mr. Fortune's arrest.

{¶6} A grand jury indicted Mr. Fortune on four counts of rape and five counts of sexual battery. Three of his rape counts and four of his sexual battery counts related to D.M. Those counts alleged that he sexually assaulted her at various points between January 2007 and September 2010 when she would have been between ten and fourteen years old. The remaining rape count and the remaining sexual battery count related to M.F. Those counts alleged that he sexually assaulted her between July 2009 and July 2010 when she would have been between nine and ten years old.

{¶7} Mr. Fortune moved to dismiss his indictment based on pre-indictment delay, but the court denied his motion. He then waived his right to a jury trial, and a bench trial ensued. The court found him guilty of the two counts related to M.F., but not guilty of his remaining counts

(i.e., those related to D.M.). The court sentenced Mr. Fortune to a total of fifteen years to life in prison.

{¶8} Mr. Fortune now appeals from his convictions and raises four assignments of error for our review. To facilitate our review, we reorder several of his assignments of error.

II.

**Assignment of Error III**

**The trial court erred in denying [Mr. Fortune's] motion to dismiss for prejudicially delayed prosecution[.]**

{¶9} In his third assignment of error, Mr. Fortune argues that the trial court erred when it denied his motion to dismiss without setting forth findings of fact and conclusions of law. We disagree.

{¶10} Crim.R. 12(F) requires a trial court to "state its essential findings on the record" when ruling on a motion to dismiss. Crim.R. 12(F). Yet, "[the rule] is not self-executing[.]" *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 112. "[S]uch findings must be placed upon the record only upon 'the defendant's request.'" *State v. Larsen*, 9th Dist. Medina No. 2363-M, 1995 WL 125577, *2 (Mar. 22, 1995), quoting *Bryan v. Knapp*, 21 Ohio St.3d 64 (1986), syllabus. "[I]f a defendant does not request findings of fact, any error is forfeited." *Adams* at ¶ 112. *Accord State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 47.

{¶11} Mr. Fortune has not challenged any substantive aspect of the trial court's ruling on his motion to dismiss. His only argument is that the court committed a procedural error when it summarily denied his motion. Yet, the record reflects that Mr. Fortune never asked the court to issue findings of fact in support of its ruling. Nor did he object when it issued an abbreviated ruling. Because Mr. Fortune did not invoke Crim.R. 12(F) or otherwise bring this issue to the trial

court's attention, he forfeited any error related to its failure to state its findings on the record. *See Adams* at ¶ 112; *LaMar* at ¶ 47. As such, his third assignment of error is overruled.

### Assignment of Error IV

**[Mr. Fortune's] conviction was against the manifest weight of the evidence.**

{¶12} In his fourth assignment of error, Mr. Fortune argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶13} When considering an argument that a criminal conviction is against the manifest weight standard, this Court is required to

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction[,]" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶14} A rape occurs when a person engages in sexual conduct with another person who is less than thirteen years of age. *See* R.C. 2907.02(A)(1)(b). A sexual battery occurs when a person engages in sexual conduct with another person and is their "natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis * * *." R.C. 2907.03(A)(5). The trial court found that Mr. Fortune committed one count of rape and one count of sexual battery against M.F. when she was between nine and ten years old.

{¶15} M.F. testified that Mr. Fortune was her adoptive father and that her family consisted of him, her mother, an older sister (D.M.), a younger sister, and a younger brother. She recalled that Mr. Fortune engaged in sexual activity with her about four to five times when she was nine

years old, but she was only able to recount the details surrounding two of those incidents. During one of the incidents, M.F. recalled falling asleep on the family's living room couch and waking to find Mr. Fortune's mouth on her vagina. She could remember feeling "the wetness of his tongue and his beard hairs." She also remembered pretending to sleep and just letting the assault happen.

{¶16} The second incident M.F. recalled also occurred in their family's living room. M.F. recalled being asleep on the couch and waking to find Mr. Fortune touching the area around her vagina. Penetration did not occur, but M.F.'s pants and underwear were down around her ankles, and Mr. Fortune was making direct contact with her vaginal area. Startled by the realization that he was touching her, M.F. drew up her knees and pushed Mr. Fortune away with her feet. She stated that, in response, he asked what was wrong and said he was giving her a massage. She then retreated to her older sister D.M.'s bedroom, woke her, and told her Mr. Fortune had touched her.

{¶17} M.F. testified that she saw three different counselors after she turned fourteen, but never told them about the abuse. D.M. was the first person she told, and she later confided in a few friends. M.F. recalled that she also briefly spoke to her mother about the abuse when she was nine years old. She remembered riding in the car with her mother and D.M. and her mother receiving a phone call. The phone call was from an older friend of D.M.'s and, during the call, the friend told M.F.'s mother that she (the friend) was having a sexual relationship with Mr. Fortune. M.F. recalled her mother being extremely upset and questioning how something like that could have happened. According to M.F., D.M. responded by telling their mother it had happened to her. D.M. then nudged M.F., and M.F. likewise said it had happened to her. M.F. indicated that their mother did not believe anything had transpired, so nothing came of their disclosure.

{¶18} M.F. testified that, after she turned seventeen, she was referred to a psychiatrist due to severe depression and anxiety. According to M.F., she did not plan on disclosing the abuse at

that time, but her new psychiatrist had an aggressive style and coaxed it out of her. The psychiatrist then reported the abuse to the authorities, and M.F. was interviewed at the child advocacy center. Consistent with her testimony, she told the interviewer that Mr. Fortune had sexually abused her four to five times when she was around nine years old and that those incidents occurred when she was sleeping on the family's living room couch.

{¶19} D.M. testified that she was three years older than M.F. and, much like her sister, had been sexually abused by Mr. Fortune. She described how he began molesting her at a young age and progressed to vaginally raping her as time went on. When she was ten or eleven years old, her mother and Mr. Fortune had an argument, and D.M. told her mother about the abuse. She testified that her disclosure caused a great deal of discord and she overheard upsetting conversations between the adults in the household, including Mr. Fortune's mother. Because she was greatly upset by their reaction to her disclosure, D.M. recanted and told her mother that the abuse had just happened in her bad dreams.

{¶20} D.M. recalled the night that M.F. rushed into her bedroom and told her that Mr. Fortune had touched her. She testified that Mr. Fortune had been in her bedroom earlier that evening and had repeatedly attempted to touch her vagina. After she pushed him away and told him to leave, Mr. Fortune left her room. A short while later, however, M.F. ran into the room, crying that he had touched her. D.M. testified that she felt guilty as a result the incident because, had she not rejected Mr. Fortune's advances, he would have left her sister alone.

{¶21} D.M. acknowledged that she saw a counselor not long after Mr. Fortune began abusing her and never disclosed the abuse. She explained that she was very young at the time and went to the counselor as part of a custody dispute between her mother and biological father. Thus, the focus of those sessions was not on Mr. Fortune. Apart from the attempt she made to tell her

mother about the abuse, D.M. did not speak to any authority figure about the abuse until an officer contacted her about M.F.'s disclosure. D.M. then divulged that she too had been abused and met with the police for an interview.

{¶22} D.M. completed a written statement at the conclusion of her interview. Additionally, at the request of the prosecutor, she completed a more detailed written statement just before trial. The defense was able to point out a number of inconsistencies between her interview, her two written statements, and her testimony. For example, she recounted instances of oral sex in her second written statement, but explicitly denied that any oral sex had occurred when she was asked about it during her police interview. D.M. testified that additional details came to her as time went on. She testified that she initially found it difficult to recall many of the details because she had spent so long trying not to remember what happened.

{¶23} In her second written statement and on cross-examination, D.M. indicated that she told two friends about Mr. Fortune's abuse. One of those friends testified at trial. The friend testified that she met D.M. in eighth grade and the two became close. She also later befriended M.F. and sometimes spent time alone with her. According to the friend, both D.M. and M.F. disclosed to her that Mr. Fortune had sexually abused them. She recalled D.M. disclosing in September 2016 and M.F. disclosing in June 2017, about two months before M.F. told her psychiatrist. The friend indicated that neither of the girls offered any details about the abuse other than that it had happened. The friend recalled that M.F.'s disclosure occurred while they were driving around and M.F. was "just kind of ranting" about things in her life. While ranting, she told the friend that Mr. Fortune was not even her biological father and that he had molested her.

{¶24} Captain Anthony Lemmon was the lead investigator in this matter and spoke with both M.F. and D.M. He testified that he was familiar with Mr. Fortune because he had previously

spoken to him about a sexual relationship he was having with a teenage girl. The captain met Mr. Fortune at work to discuss M.F.'s accusations and recorded their conversation. During the conversation, Mr. Fortune said there were many past events he could not recall because he damaged his memory when he attempted suicide and spent several days in a coma. He told Captain Lemmon that he knew there was one occasion where he rubbed M.F.'s leg on the family's couch because she was having growing pains. Mr. Fortune remembered her suddenly calling him a name and running off, but he had no memory of touching her vagina. He did not recall ever touching her inappropriately. Nevertheless, he told the captain more than once that any accusations she had made against him must be true because he raised her to always be truthful.

{¶25} D.M. and M.F.'s mother testified about the family's living arrangements over the years and her relationship with Mr. Fortune. She testified that the two split up when he started sleeping with a teenage girl, but that they reconciled when that relationship ended, he attempted suicide, and he spent several weeks recuperating. The mother claimed that the police never sought to interview her about the abuse allegations. It was her opinion that D.M. could not have been raped several times a week for an extended period without her knowledge. The mother agreed that D.M. accused Mr. Fortune of abuse when she was about ten, but she noted that D.M. had quickly recanted and assured her nothing had happened. As for M.F., the mother claimed that M.F. never told her about any abuse and that she first learned of those accusations when M.F. visited her new psychiatrist. The mother would not say outright that she did not believe her daughters, but she did testify that she did not believe the extent of their allegations. She noted that other adults frequently lived with them throughout the years, so there was almost always more than one adult present when the girls were home. She also noted that were long stretches of time when Mr. Fortune was away because he was traveling for work. The mother maintained that she had no inclination

anything inappropriate had ever happened and, had there been ongoing abuse, she would have noticed.

{¶26} Contrary to the mother's testimony, Captain Lemmon testified that he asked her to come to the police station for an interview. He indicated that she cooperated when he spoke with her at her house, but she did not want to be formally interviewed at the police station. He also indicated that she "was not forthcoming with information" when he asked her questions.

{¶27} The defense called two witnesses who lived with D.M., M.F., and their family at various points. One witness testified that he was the mother's cousin, he lived with the family for about four years, and he never suspected the girls were being sexually abused. The second witness testified that she came to live with the family because her mother was acquainted with Mr. Fortune. She estimated that she lived with the family for five to six months and never personally observed any signs of abuse. The second witness testified that she remembered the mother coming to her one day and sharing with her that D.M. had accused Mr. Fortune of sexual assault. She also remembered the mother coming to her again and telling her the accusations were not true and were just a product of bad dreams D.M. had experienced. The second witness testified that she had a sexual relationship with Mr. Fortune for a year or more and that he was well-endowed. It was her opinion that, had he raped either D.M. or M.F., they would have displayed some signs of injury or there would have been some sort of evidence of abuse.

{¶28} D.M. and M.F.'s younger sister was twelve years old at the time of trial and also testified for the defense. The younger sister testified that her parents had a tumultuous relationship and that, around 2016 to 2017, D.M. and M.F. started encouraging their mother to leave Mr. Fortune. She indicated that D.M. became upset with Mr. Fortune when he began having a sexual relationship with one of her older friends and when he refused to allow her boyfriend to move into

the house. Meanwhile, M.F. became upset with him because he refused to buy her a car and she found out he was not her biological father. According to the younger sister, when D.M. and M.F. realized that their mother needed a good reason to leave Mr. Fortune, they concocted a plan to accuse him of sexual abuse.

{¶29} According to the younger sister, D.M. and M.F. believed they could use Mr. Fortune's memory loss to their advantage, as he would not be able to recall earlier incidents they claimed had happened. She also testified that D.M. thought there was a statute of limitations on rape that had already expired so that there would be no danger of his incarceration. Although her sisters wanted her to join in their plan, the younger sister testified that she refused to do so. She stated that, unbeknownst to her sisters at the time, she had been raped one month earlier and wanted to distance herself from their plan as much as possible. Yet, she claimed that she would still hear about it as her sisters discussed it within earshot. The younger sister claimed that, after Mr. Fortune was released on bond in this matter, her sisters approached her "freaking out" because they knew there were issues with their stories and they needed "to figure out all the loopholes and make everything fit." At that point, they decided to fabricate more details, and D.M. provided the prosecution with a lengthier written statement.

{¶30} The younger sister testified that she was in counseling and, as a therapeutic tool, her counselor taught her to journal. She ultimately wrote two typewritten stories, one of which was a journal and one of which she submitted as a project for school. Both pieces recounted the abuse allegations and their impact on the family, with the school project manifesting as a fictionalized account in which names had been changed. In the journal, the younger sister specifically wrote about her older sisters fabricating the abuse allegations against Mr. Fortune. According to the younger sister, she never meant for anyone to see her journal, but Mr. Fortune

discovered a copy of it on his laptop, read it, and provided it to the defense. The younger sister testified that, after her journal emerged, D.M. threatened to harm her.

{¶31} Mr. Fortune hired a private investigator as part of his defense, and the investigator testified at trial. He testified that Mr. Fortune provided him with the younger sister's typewritten stories one month before trial, after which he interviewed the younger sister on at least four separate occasions. The investigator was aware that the younger sister was working with the police in a separate matter related to a man who had raped her. Yet, he was not aware that, during that investigation, she was interviewed several times by the prosecutor and a victim advocate, both of whom asked her questions about her older sisters.

{¶32} On rebuttal, the State called the victim advocate who was present when the prosecutor interviewed the younger sister about the rape she had suffered. The victim advocate testified that they met with the younger sister multiple times and frequently brought up the case against Mr. Fortune as it was going forward at the same time and was a huge source of stress for her. According to the victim advocate, the younger sister stated that Mr. Fortune was the only member of her family with whom she had a close relationship and she "never [spoke] to her sisters in any way in regards to the sexual abuse they incurred." The younger sister told the victim advocate that she hoped the allegations were not true because she "would be very devastated if [Mr. Fortune] went to jail or prison * * *."

{¶33} Mr. Fortune argues that his convictions are against the manifest weight of the evidence. He notes that the trial court acquitted him of the charges related to D.M. due to the number of inconsistencies in her story. Even so, he argues, her testimony directly contributed to his convictions on the charges related to M.F. He argues that there was no physical evidence to support his convictions and, apart from the testimony of the girls, the testimony weighed in his

favor. He notes that the girls' own mother testified that it was impossible they were abused in the way they claimed, given her observations, his work schedule, and the number of people who frequently stayed at the house. Further, he argues that the younger sister's testimony irrefutably showed that D.M. and M.F. fabricated their accusations. Mr. Fortune avers that it was illogical for the trial court to refuse to believe one accuser only to find the other credible. As such, he asserts that the court lost its way by convicting him.

{¶34} Upon review, we cannot conclude that the trier of fact clearly lost its way when it found Mr. Fortune guilty of raping and sexually battering M.F. *See Otten*, 33 Ohio App.3d at 340. M.F. described two incidents where Mr. Fortune either performed oral sex on her or touched her vagina. D.M. remembered M.F. seeking her out after one of those incidents, and their friend also remembered M.F. telling her that Mr. Fortune had molested her. Although the younger sister claimed that D.M. and M.F. had fabricated their accusations, there was testimony that she was very close to Mr. Fortune and upset about the prospect of him going to prison. There also was testimony that she had told her victim advocate she was not close to her sisters and had never talked to them about their abuse allegations. As the trier of fact, the court was in the best position to consider the conflicting evidence and reasonably could have chosen to disbelieve the testimony of the younger sister. *See State v. Andrews*, 9th Dist. Summit No. 29260, 2020-Ohio-2703, ¶ 31 (trier of fact in best position to evaluate witness credibility). Likewise, the court could have chosen to disregard the mother's assurances that ongoing abuse had not occurred, given the testimony that she "was not forthcoming with information" and had not been inclined to believe her daughters when they were younger and first disclosed the abuse. Mr. Fortune specifically told Detective Lemmon that any accusations M.F. had made against him must have been true because he raised her to always be truthful. His convictions are not against the weight of the evidence simply because

the trial court chose to believe the State's witnesses and its version of the events. *See State v. Hill*, 9th Dist. Summit No. 26519, 2013-Ohio-4022, ¶ 15 ("This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witness' testimony over the testimony of others.").

{¶35}  Although the trial court did not convict Mr. Fortune of the charges related to D.M., it indicated that it "truly believe[d] that something happened" to her and was "fairly convinced" of those allegations. The court simply found that the State fell short of its burden on those counts. As the trier of fact, it was the court's prerogative "to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. The court, therefore, could have chosen to rely on portions of D.M.'s testimony for purposes of the counts related to M.F. *See id.* The court's decision to do so did not render Mr. Fortune's verdicts inconsistent and, in any event, "even inconsistent responses on separate counts will not justify overturning a verdict." *See State v. Fridley*, 9th Dist. Wayne No. 17AP0029, 2019-Ohio-3412, ¶ 22. Upon review, Mr. Fortune has not shown that this is the exceptional case where the evidence weighs heavily against his convictions. *See Otten* at 340. Accordingly, his fourth assignment of error is overruled.

## Assignment of Error II

**[Mr. Fortune's] right to a fair trial was compromised by prosecutorial misconduct in failing to investigate exculpatory evidence and instead directing a witness to create a new statement[.]**

{¶36}  In his second assignment of error, Mr. Fortune argues that prosecutorial misconduct deprived him of a fair trial. Specifically, he argues that the prosecutor engaged in misconduct when he failed to have the police investigate the younger sister's claim that D.M. and M.F. lied and, instead, instructed D.M. to write a more detailed statement. We reject his argument.

{¶37} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24.

{¶38} If a defendant fails to object to alleged prosecutorial misconduct, he forfeits all but plain error. *State v. Rivera*, 9th Dist. Lorain No. 18CA011263, 2019-Ohio-62, ¶ 24. *Accord State v. Dawson*, 9th Dist. Summit No. 28311, 2017-Ohio-2833, ¶ 36. Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Nevertheless, "[t]his Court will not 'fashion a plain error argument on [a defendant's] behalf and then address it sua sponte.'" *State v. Rouse*, 9th Dist. Summit No. 28301, 2018-Ohio-3266, ¶ 15, quoting *State v. Patterson*, 9th Dist. Lorain No. 16CA011035, 2017-Ohio-8196, ¶ 24.

{¶39} The record reflects that Mr. Fortune discovered the younger sister's writings on his computer about a month before trial and turned them over to his counsel. His counsel then gave the writings to their private investigator, and he repeatedly interviewed the younger sister. The defense did not provide her writings to the prosecution until less than two weeks before trial. The prosecutor then met with D.M. and M.F. to discuss what the younger sister had written. Rather than provide the younger sister's writings to Captain Lemmon, the prosecutor ultimately asked D.M. to write another statement. According to Mr. Fortune, the prosecutor ignored his duty to

pursue exculpatory evidence when he failed to give the younger sister's writings to the police and instead told D.M. to provide additional evidence.

{¶40} The record reflects that Mr. Fortune never raised the issue of prosecutorial misconduct at the trial court level. Because he failed to do so, he forfeited his argument save for a claim of plain error. *See Rivera* at ¶ 24; *Dawson* at ¶ 36. Mr. Fortune has not argued plain error on appeal, and this Court is not inclined to construct that argument on his behalf. *See Rouse* at ¶ 15, quoting *Patterson* at ¶ 24. *See also State v. Bortner*, 9th Dist. Lorain No. 02CA008189, 2003-Ohio-3508, ¶ 22. Further, he has made no attempt to demonstrate how his substantial rights were actually prejudiced by the prosecutor's conduct. *See Smith*, 14 Ohio St.3d at 14. The defense had access to the younger sister's writings two weeks before the prosecutor and used that time to investigate her claims. Mr. Fortune chose not to provide those writings to the police himself, and it is unclear what additional exculpatory evidence, if any, he believes the police would have uncovered had the prosecutor asked Captain Lemmon to investigate the writings. Because Mr. Fortune forfeited his argument and, in any event, has not attempted to explain how he was substantially prejudiced by the prosecutor's actions, this Court rejects his argument. Mr. Fortune's second assignment of error is overruled.

### Assignment of Error I

**[Mr. Fortune] was deprived of his fair trial when the presiding judge, in a bench trial, failed to disclose to defense counsel knowledge of prior allegations which the trial judge found pertinent[.]**

{¶41} In his first assignment of error, Mr. Fortune argues that he was deprived of a fair trial due to bias on the part of the trial judge. He argues that the judge was influenced by his knowledge of facts outside the record and failed to disclose those facts to defense counsel until sentencing. Because the judge's impartiality reasonably could have been questioned, Mr. Fortune

avers, his failure to recuse himself offended his due process rights. Upon review, we reject Mr. Fortune's argument.

{¶42} The issue of whether a conviction must be vacated due to bias or prejudice on the part of a trial judge is one that lies exclusively within the jurisdiction of the Chief Justice of the Ohio Supreme Court. *See State v. Polke*, 9th Dist. Medina No. 18CA0061-M, 2019-Ohio-904, ¶ 7; R.C. 2701.031. This Court lacks authority "to void a trial court's judgment on the basis of personal bias or prejudice on the part of the trial judge * * *." *State v. Hunter*, 151 Ohio App.3d 276, 2002-Ohio-7326, ¶ 18 (9th Dist.), citing *Beer v. Griffith*, 54 Ohio St.2d 440, 441-442 (1978). Nevertheless, we may determine whether conduct on the part of a trial judge denied a criminal defendant due process of law. *See, e.g., State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2017-Ohio-4030, ¶ 8-13. "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5.

{¶43} According to Mr. Fortune, the trial judge demonstrated bias against him when he admitted that he had knowledge of a presentence investigation report ("PSI") that was completed in 1996. He claims that the judge admitted to having read the report in 1999 when it sentenced him to three years in prison on an unrelated matter. Mr. Fortune avers that the contents of that PSI were never made available to him or his counsel, and the court never informed them that he was intimately familiar with its contents. Because the judge possessed that knowledge about Mr. Fortune before acting as the trier of fact in this matter and before sentencing him, he argues that the judge's statements about the PSI's contents raised significant concerns about his impartiality.

{¶44} It is undisputed that no PSI was completed in this case. At sentencing, however, the trial judge made the following statements:

The court does have a [PSI] that was done in 1996, which has biographical information, social history regarding Mr. Fortune up to that date. That [PSI] involved charges of breaking and entering and theft, which the other judge, at that time, sentenced Mr. Fortune to prison for 3 years. I picked up a case 3 years later involving an unauthorized use of a motor vehicle, to which he pleaded guilty in 1999 and I gave him concurrent time * * *. That [PSI] contains information about Mr. Fortune's juvenile record, some of which, I think should be mentioned, I think it's pertinent.

The court then went on to discuss that information. It is not entirely clear from the court's statements whether it reviewed one PSI from 1996 or one from 1996 and another from 1999. The record does not contain the PSI(s), and Mr. Fortune did not object to the court's reference to the PSI(s).

{¶45} Upon review, this Court rejects Mr. Fortune's argument that bias on the part of the trial judge denied him a fair trial. First, the record does not contain the PSI(s) that the court referenced during sentencing, so this Court cannot examine the information contained therein. It was Mr. Fortune's duty to ensure that the appellate record contained the PSI(s), and he failed to fulfill that duty. *See State v. Collins*, 9th Dist. Lorain No. 19CA011462, 2020-Ohio-317, ¶ 14. Second, Mr. Fortune did not object to the trial judge's statements, his consideration of the PSI(s), or his alleged bias. His failure to object resulted in a forfeiture and, once again, he has not argued plain error on appeal. *See State v. Piatt*, 9th Dist. Wayne. No. 19AP0023, 2020-Ohio-1177, ¶ 45. Finally, if Mr. Fortune believed the trial judge was prejudiced or had exhibited bias, he had the ability to file an affidavit of disqualification with the Ohio Supreme Court. *See State v. Smetana*, 9th Dist. Lorain No. 12CA010252, 2013-Ohio-2376, ¶ 10. This Court "has no authority to render a decision with regard to disqualification * * * or to void a trial court's judgment on the basis of personal bias or prejudice on the part of the trial judge * * *." *Hunter*, 151 Ohio App.3d 276, 2002-Ohio-7326, at ¶ 18, citing *Beer*, 54 Ohio St.2d at 441-442. Accordingly, Mr. Fortune's first assignment of error is overruled.

III.

{¶46} Mr. Fortune's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, J.
CONCURS.

CARR, P. J.
<u>CONCURRING IN JUDGMENT ONLY.</u>

{¶47} While I concur in the majority's resolution of this appeal, I write separately to note that I would overrule the first assignment of error on the basis that Fortune has not demonstrated that his due process rights were violated at trial. I concur in the remainder of the opinion.

<u>APPEARANCES:</u>

DONOVAN HILL, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.