[Cite as *State v. Runk*, 2021-Ohio-777.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

v.

ERIC D. RUNK

    Appellant

C.A. No.     19CA0073-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     18CR1082

DECISION AND JOURNAL ENTRY

Dated: March 15, 2021

---

TEODOSIO, Judge.

{¶1}    Defendant-Appellant, Eric Runk, appeals from the judgment of the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2}    Mr. Runk and his wife were friends with I.H., the victim in this matter. Late one evening, I.H. began sending them troubling messages wherein she indicated that she had been drinking, that no one cared for her, and that she wanted to die. The two exchanged messages with her for some time, and Mr. Runk eventually told I.H. that he was coming to get her. He picked up I.H. at her house and brought her back to the house he shared with his wife.

{¶3}    I.H. consumed a considerable amount of alcohol before Mr. Runk arrived and ingested several of her prescription anxiety pills. She did not recall traveling to Mr. Runk's house or being brought inside. At some point, however, she realized she was in Mr. Runk's guest bedroom and he was standing over her. According to I.H., Mr. Runk climbed into bed and had

sex with her as she repeatedly lost and regained consciousness. She indicated that she was unable to move or fend him off because she continued to lose consciousness. She next recalled waking up in the guest bedroom the following morning.

{¶4} I.H.'s daughter picked her up in the morning to bring her home. On the ride home, I.H. told her daughter that Mr. Runk had raped her. Her daughter convinced her to go to the hospital, and I.H. underwent a sexual assault examination later that same day. She also sent messages to Mr. Runk and asked him whether they had had sex the previous evening. Mr. Runk repeatedly denied that they had engaged in sexual intercourse. Likewise, when a detective interviewed him a few weeks later, Mr. Runk repeatedly denied having had sex with I.H. The detective collected Mr. Runk's DNA, and forensic testing confirmed that Mr. Runk could not be excluded as the source of the male DNA that scientists uncovered when testing the samples from I.H.'s rape kit.

{¶5} A grand jury indicted Mr. Runk on one count of rape and one count of sexual battery. The matter proceeded to a jury trial, at the conclusion of which the jury found him guilty of both counts. The court determined that Mr. Runk's counts were allied offenses of similar import, and the State elected to have him sentenced on the rape count. The court sentenced him to five years in prison and classified him as a tier III sexual offender.

{¶6} Mr. Runk now appeals from the trial court's judgment and raises two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S JUDGMENT OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF EVIDENCE REQUIRING REVERSAL OF APPELLANT'S CONVICTION.

{¶7}   In his first assignment of error, Mr. Runk argues that his guilty verdicts for rape and sexual battery are against the manifest weight of the evidence.  We do not agree.

{¶8}   This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony."  *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5.  This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  *See also Otten* at 340.

{¶9}   Rape occurs when an offender engages in sexual conduct with someone other than their spouse, the other person's "ability to resist or consent is substantially impaired because of a mental or physical condition * * *," and the offender "knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired * * *."  R.C. 2907.02(A)(1)(c).  Sexual battery occurs when an offender engages in sexual conduct with someone other than their spouse with knowledge "that the other person's ability to appraise the nature of or control [her] own conduct is substantially impaired."  R.C. 2907.03(A)(2).  "[S]ubstantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct."  *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987).  "[V]oluntary intoxication is a mental

or physical condition that could cause substantial impairment." *State v. Hansing*, 9th Dist. Lorain No. 16CA011053, 2019-Ohio-739, ¶ 14.

{¶10} At trial, the defense conceded that Mr. Runk had sexual intercourse with I.H. The only question was whether it was consensual. Mr. Runk argues that the jury lost its way when it chose to believe (1) that I.H. was too impaired to resist or consent to sexual intercourse, and (2) that he was aware of that fact when he had sex with her. He notes that I.H. was able to send text and photo messages that evening, all of which were lucid and legible. He also notes that she was able to walk without stumbling and to carry on a conversation with him. According to Mr. Runk, I.H. changed small details of her story or withheld certain aspects of it, depending on her audience. He claims that she had consensual sex with him and fabricated the rape as a result of the guilt she felt afterward. Because I.H. was not credible, Mr. Runk argues, the jury's verdicts are against the manifest weight of the evidence.

{¶11} I.H. testified that she used to date Mr. Runk's best friend and, through that relationship, became friends with Mr. Runk and his wife. She frequently socialized with the couple and continued to do so even after her relationship with Mr. Runk's best friend ended. Additionally, her adult daughter would babysit Mr. Runk's three children from time to time. Though I.H. had a closer relationship with Mr. Runk's wife, she also considered Mr. Runk to be her friend.

{¶12} A few months after they became friends, Mr. Runk began flirting with I.H. Occasionally, he also would send her messages of a sexual nature. I.H. testified that she always downplayed the messages or changed the subject because she was not interested in having a sexual relationship with Mr. Runk. Up until these events occurred, the two had never engaged in any sexual activity.

{¶13}   I.H. testified that she suffered from depression and anxiety.  On the day that led to the events herein, she became extremely depressed because she was having significant financial problems and lost a job opportunity.  She began drinking that evening and estimated that she ultimately consumed around twelve or thirteen alcoholic beverages.  Additionally, she recalled taking about eight of the pills she had been prescribed for her anxiety.  I.H. stated that she took the pills and consumed the alcohol because she "felt like [she] just couldn't take [her] life" anymore.

{¶14}   As the evening wore on, I.H. began sending messages to Mr. Runk and his wife via Facebook Messenger.  The two were driving home from a family function in separate vehicles and responded separately to her messages.  In the messages, I.H. repeatedly indicated that she had no one and wanted to die.  She rejected the attempts of Mr. Runk and his wife to console her and sent a picture of pill bottles resting on a table with the message "I don't want to wake up[.]"  Just after midnight, Mr. Runk messaged I.H. that he would come and get her so that she could spend the night at their house.

{¶15}   I.H. testified that she had limited memories of the events that occurred after Mr. Runk offered to get her because she was "kind of in and out of consciousness with the medicine and the drinking."  She did not recall him picking her up or driving her to his house, but she did remember someone putting her into bed in his guest bedroom.  Her next memory was of Mr. Runk standing beside her as she lay on the bed.  She testified that she asked him where his wife and children were, and he said the children were sleeping and his wife had left to get food.  According to I.H., Mr. Runk then said, "I've been waiting a long time for this," and climbed into bed with her.

{¶16}   I.H. testified that she repeatedly lost and gained consciousness as Mr. Runk pulled down her shorts and proceeded to have sexual intercourse with her.  She indicated that she was

shocked and felt unable to move or defend herself because she kept blacking out. She next remembered Mr. Runk wiping something off the bed and his wife coming into the room with food and water for her. I.H. then blacked out again and had no memories until the following morning. When she awoke, she felt some tenderness in her vaginal area and realized she "was kind of messy down there * * *."

{¶17} I.H.'s adult daughter came to get her that morning. On their ride home, I.H. told her daughter that she was "almost positive" Mr. Runk had raped her. Though she could not recall every detail of the previous evening, the memories she had and the physical sensations she felt when she awoke convinced her that the rape had occurred. I.H. testified that her daughter ultimately persuaded her to go to the hospital, and she underwent a rape exam later that day.

{¶18} I.H.'s daughter testified that she lived with I.H. when these events transpired, but was not home that evening because she spent the night with her aunt. The daughter confirmed that I.H. had already started drinking when she left the house around 8:00 p.m. to meet her aunt. She also confirmed that I.H. was suffering from a lot of stress at the time.

{¶19} The daughter testified that, after she left home, she spoke with I.H. twice by phone. Around 11:30 p.m., she received a text message from Mr. Runk's wife, asking her to call I.H. and make sure everything was okay. The daughter complied and briefly spoke with I.H. She testified that their first conversation did not cause her any concern because I.H. reassured her that everything was okay. A short while later, however, Mr. Runk's wife sent her another message, and the daughter called I.H. a second time. This time, their conversation worried the daughter because I.H. sounded like she had been crying. Even so, the daughter testified, she was unable to drive home to I.H. because she had been drinking.

{¶20} The daughter testified that she drove to Mr. Runk's the following morning to pick up I.H. When she saw her mother, she immediately noticed that I.H. was anxious and acting as if she wanted to leave quickly. The two left for home and, on the ride back, I.H. began crying. I.H. then told her daughter that she thought Mr. Runk had raped her. The daughter testified that I.H. initially did not want to go to the hospital, so they returned home. Once I.H. rested for a bit, she allowed her daughter to take her to the hospital.

{¶21} A registered nurse performed a sexual assault examination at the hospital, and the swabs collected during her examination were forwarded to the Bureau of Criminal Identification ("BCI"). Forensic scientists at BCI uncovered a component of sperm in I.H.'s swabs, as well as the DNA profile of an unidentified male. A scientist later compared the unknown DNA profile to Mr. Runk's profile and determined that his profile was consistent with the profile BCI found on the swabs from I.H.'s rape kit.

{¶22} The same day that I.H. underwent her sexual assault examination, she sent a message to Mr. Runk via Facebook Messenger. She testified that she reached out to him because she wanted to see if he would admit that anything had happened between them. After they exchanged a few friendly messages, I.H. asked Mr. Runk whether they had engaged in sexual intercourse the previous evening. Mr. Runk replied that they had not, but that I.H. had thrown up in his truck. The two traded a few more messages before I.H. broached the subject again in the following manner:

> [I.H.:] * * * I'm pretty sure we had sex to lol my v jay jay was sour this morning lol
>
> [I.H.:] I remember u laying with me

A stretch of time passed before Mr. Runk responded:

[Mr. Runk:]  Glad ur doing better.  U ever feeling depressed like that again, reach out and come visit.  U get to hang out with the boys at all this morning?

[I.H.:]  Yes and why are u avoiding my question lol

[Mr. Runk:]  I didn't.  Lol.  Maybe u used your toy?  Haha

I.H. testified that she stopped asking Mr. Runk about any sexual encounter at that point because she understood that he had no intention of telling her the truth.

{¶23}  A week or two later, Detective Keith Curtin interviewed I.H. at her home, and she provided him with the messages she had exchanged with Mr. Runk.  He and another officer then paid an announced visit to Mr. Runk at his home.  Although they knocked, walked around the house, and remained outside for about fifteen minutes, no one answered the door.  The officers decided to return to their vehicle and wait a short while because there were cars parked in Mr. Runk's driveway.  About fifteen minutes later, Mr. Runk and his wife emerged from the house, entered one of their vehicles, and drove off.  Detective Curtin stopped their vehicle and learned that they were driving to the doctor.  He, therefore, provided Mr. Runk with his card and instructed him to call after their appointment.

{¶24}  Mr. Runk called Detective Curtin, and they arranged to meet at Mr. Runk's house the following day.  The detective spoke with Mr. Runk outside for a little over twenty minutes and asked him about his evening with I.H.  He also recorded their conversation, and the State played the recording for the jury at trial.

{¶25}  Mr. Runk indicated that he picked up I.H. because she had sent several messages alluding to the fact that she was suicidal.  He admitted that he knew she had been drinking and that she threw up in his truck.  At one point, he also said that he had to carry I.H. into his house when they arrived.  Mr. Runk told the detective that I.H. seemed better after she threw up and that he believed she was exaggerating or faking her behavior.  He denied that he ever walked I.H. back to

his guest bedroom, went to the guest bedroom, or had sex with her. Even when the detective suggested to Mr. Runk that I.H. might have led him on or initiated their sexual encounter, Mr. Runk denied that any sexual activity had occurred. He told the detective that he did not know why I.H. would fabricate the allegations against him.

{¶26} Mr. Runk testified in his own defense and admitted that he had sex with I.H. He testified that he picked her up because he and his wife were afraid that she might harm herself. While he knew she had been drinking, he indicated that all of her text messages were lucid and legible. He also claimed that her motor skills were intact when he arrived at her home, as he watched her walk around and traverse the stairs more than once without incident. Mr. Runk testified that he spoke with I.H. for a short while before she walked to another room to pack an overnight bag. When she left the room, he shook her pill bottle and noted that it was still noticeably full. He, therefore, believed that she was not in any real danger and was just seeking attention.

{¶27} Mr. Runk acknowledged that I.H. threw up in his truck on the ride to his house, but testified that it seemed to be the result of anxiety and not intoxication. He claimed that the vomit was more like spit and did not appear to contain any pills. He also claimed that I.H. calmed down after she vomited. When they arrived at his house, Mr. Runk testified, his wife was waiting for them and he placed his arm around I.H. as they walked inside. He denied that he had to carry her and insisted that she walked inside of her own accord. It was his testimony that he left his wife with I.H. while he changed clothes. Shortly thereafter, his wife went to get fast food and he went to the guest bedroom to keep I.H. company.

{¶28} Mr. Runk testified that I.H. asked him to lie with her and to hold her. As he did so, I.H. began grinding her hips against him. Mr. Runk stated that he too had been drinking that day and accepted I.H.'s advances. He testified that they had consensual sex while his wife was gone

and, once they finished, they agreed to keep it a secret. According to Mr. Runk, I.H. ate the food that his wife brought home for them before they all went to bed.

{¶29} Mr. Runk acknowledged that he lied to I.H. on Facebook Messenger when she asked him whether they had engaged in sexual intercourse. He testified that her question worried him because they had agreed to keep it secret. He claimed to be concerned that, if he admitted their sexual encounter, I.H. would use his admission to extort him. He also claimed that he lied to Detective Curtin when they spoke because he did not want his wife to find out that he had cheated on her. Mr. Runk testified that he later wanted to change his initial statement, but his first attorney advised against it. Mr. Runk maintained that I.H. was lucid when they had consensual sex and that she initiated the exchange.

{¶30} I.H. acknowledged that, initially, she did not want to report the rape that occurred to the police. The incident came to the attention of the police when the nurse who performed I.H.'s sexual assault examination reported it. I.H. explained that she was hesitant to report the rape because she feared what might happen if she did. She did not know what would be expected of her, and she agreed that the last thing she wanted to have to do was testify before a jury. I.H. also acknowledged that she did not tell the nurse examiner about having taken anxiety pills on top of the alcohol she had consumed. She explained, however, that she was too embarrassed to tell the nurse that detail.

{¶31} Having reviewed the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found Mr. Runk guilty of rape and sexual battery. *See Otten*, 33 Ohio App.3d at 340. The jury was essentially presented with two conflicting versions of the events. Neither Mr. Runk, nor I.H. were perfectly consistent in their respective renditions, and the jury was in the best position to assess their credibility. *See State v. Johnson*,

9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. The jury heard testimony that Mr. Runk repeatedly lied about having sex with I.H. Even when the detective suggested that I.H. may have led him on or initiated their encounter, Mr. Runk denied that the two had engaged in sexual intercourse. To the extent he changed his story and attempted to explain his reasons for doing so at trial, the jury was not obligated to accept his explanation. This Court has repeatedly rejected the notion that a verdict is against the manifest weight of the evidence simply "because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Because Mr. Runk has not shown that this is the exceptional case where the evidence weighs heavily against his conviction, we reject his argument to the contrary. *See Otten* at 340. His first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DENIED HIS RIGHT TO A FAIR TRIAL WHEN TRIAL COUNSEL FAILED TO CALL A CRITICAL EYEWITNESS WHOSE TESTIMONY WOULD HAVE CORROBORATED APPELLANT'S DEFENSE OF CONSENT.

{¶32} In his second assignment of error, Mr. Runk argues that he received ineffective assistance of counsel because his attorney never called his wife to testify as a defense witness. For the following reasons, we reject his argument.

{¶33} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, one must establish that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State*

*v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice can be shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus. "[T]he Court need not address both *Strickland* prongs if an appellant fails to prove either one." *State v. Lortz*, 9th Dist. Summit No. 23762, 2008-Ohio-3108, ¶ 34.

{¶34} According to Mr. Runk, he received ineffective assistance of counsel because his wife should have been called to testify as a witness for the defense. He notes that his wife was an eyewitness to the events immediately preceding the alleged rape, as well as the events that followed thereafter. Had his wife testified, Mr. Runk argues, she would have confirmed that I.H. was not substantially impaired or upset in the wake of the alleged rape. According to Mr. Runk, the jury would have acquitted him if they heard his wife testify. Thus, he argues that he was prejudiced by his attorney's failure to call her as a witness.

{¶35} Generally speaking, the decision "whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490 (2001). More importantly, "'a claim of ineffective assistance of counsel on direct appeal cannot be premised on decisions of trial counsel that are not reflected in the record of proceedings[,] * * * [or] [s]peculation regarding the prejudicial effects of counsel's performance * * *." *State v. Fridley*, 9th Dist. Wayne No. 17AP0029, 2019-Ohio-3412, ¶ 32, quoting *State v. Leyland*, 9th Dist. Summit Nos. 23833, 23900, 2008-Ohio-777, ¶ 7. Mr. Runk presumes that his wife would have been willing to testify on his behalf and would have offered favorable testimony. Yet, there is no evidence in the record, demonstrating that his wife was willing to testify. Nor does the record evidence what her testimony would have been or whether it would have aided his defense. *See State v. Ball*, 9th Dist. Summit No. 26537, 2013-Ohio-3506, ¶ 41. Mr. Runk's entire

argument is based on speculation. Thus, even assuming his counsel engaged in a deficient performance, he has not established resulting prejudice. *See Bradley*, 42 Ohio St.3d 136, at paragraph three of the syllabus. Mr. Runk's second assignment of error is overruled.

III.

**{¶36}** Mr. Runk's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CALLAHAN, P. J.
CARR, J.
CONCUR.


APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.